THE PEOPLE ex rel. HECKER-JONES-JEWELL MILLING COM-
PANY, Appellant, *v.* EDWARD P. BARKER et al., Commis-
sioners of Taxes, etc., Respondents.

1. ASSESSMENT — FOREIGN CORPORATION — CERTIORARI — QUESTION
OF FACT. Where an assessment for taxation upon the property of a
foreign corporation used in its business in this state involves a question of
fact as to what indebtedness was actually incurred in the purchase of
assets here, and the evidence submitted to the assessors was not so clear
and convincing as to leave no doubt as to the fact; and the assessment
itself depends upon the different kinds of property making up the assets,
and it was not made plain what the true value of the assets was, and there
is some evidence to support the determination of the assessors as to the
true amount of the assessment, the Court of Appeals will not review and
reverse such determination upon certiorari.

2. ASSESSMENT — FOREIGN CORPORATION — SUMS INVESTED. When a
foreign corporation doing business in this state purchases property here for
its business and pays cash for a portion of it and promises to pay the balance
at a future day, or pays no cash but promises to pay in the future, the
amount still due upon the property is to be deducted from the value of
the property, to ascertain the "sums invested" in this state, in applying
the provision of chapter 37, Laws of 1855, that all non-resident persons
and associations doing business in the state of New York "shall be assessed
and taxed on all sums invested in any manner in said business the same as
if they were residents of this state." (*People ex rel. Thurber-Whyland Co.
v. Barker*, 141 N. Y. 118, limited.)

3. CORPORATE STOCK. Stock issued by a corporation in payment for
property is not a debt incurred by the corporation.

*People ex rel. v. Barker* (86 Hun, 148), reversed.

(Argued May 20, 1895; decided October 8, 1895.)

APPEALS from orders of the General Term of the Supreme
Court in the first judicial department, made April 11, 1895,
which affirmed orders of Special Term dismissing writs of
certiorari.

The facts, so far as material, are stated in the opinion.

*John M. Bowers* for appellant. The sum invested in this
state by the relator was the surplus of its assets in this state
after deducting the indebtedness incurred by it in the acquisi-
tion of such assets. (*Clark* v. *Bailey*, 12 Blatchf. 156; *Wil-*

*liams* v. *Bd. of Suprs.*, 78 N. Y. 561; *People ex rel.* v. *Barker*, 141 id. 118; 39 N. E. Rep. 1065; Thomas on Mort. 98; *Conan* v. *Lakey*, 80 N. Y. 345; *Hitchcock* v. *N. Ins. Co.*, 26 id. 68; *People ex rel.* v. *Comrs. of Taxes*, 23 N. Y. 243.) The construction put upon section 1 of chapter 37 of the Laws of 1855 by the court below makes such statute unconstitutional and void. (Laws of 1788, chap. 65; R. S. art. 2, § 9; 1 R. S. [1st ed.] 387; Laws of 1891, chap. 178, § 2; Laws of 1823, chap. 262; Laws of 1857, chap. 456; *People ex rel.* v. *Barker*, 141 N. Y. 196; 25 N. Y. Supp. 340; Laws of 1855, chap. 37, § 1; *Duer* v. *Small,* 4 Blatchf. 261; *Walling* v. *Michigan*, 116 U. S. 446; *Brown* v. *Houston*, 114 id. 622; *Wiley* v. *Parmer,* 14 Ala. 627; *Corfield* v. *Coryell*, 4 Wash. [C. C.] 371, 380; *Ward* v. *Maryland*, 12 Wall. 419, 430; 15 id. 300; *Maguire* v. *Parker*, 32 La. Ann. 832; *State* v. *Wiggin*, 64 N. H. 508; *Welton* v. *Missouri*, 91 U. S. 275; *Guy* v. *Baltimore*, 100 U. S. 434; *Robbins* v. *S. T. District*, 120 id. 489; *Asher* v. *Texas*, 128 id. 129; *Brown* v. *Maryland*, 12 Wheat. 419; *Higgins* v. *Lime*, 130 Mass. 1; *P. & C. Co.* v. *Bates*, 156 U. S. 577; *State* v. *Furbush,* 72 Maine, 493; *State* v. *North*, 27 Mo. 464; *Paul* v. *Virginia*, 8 Wall. 168; *P. M. Co.* v. *Penn.*, 125 U. S. 181; *County of Santa Clara* v. *S. & C. P. R. R. Co.*, 118 id. 394; Laws of 1892, chap. 687, §§ 15, 16; Laws of 1880, chap. 542; Laws of 1895, chap. 240; *Demarest* v. *Flack*, 128 N. Y. 205; *Lancaster* v. *A. I. Co.*, 140 id. 576; *M. Co.* v. *Gage*, 100 U. S. 676; *S. Co.* v. *Port Wardens*, 6 Wall. 31; *P. T. Co.* v. *W. U. T. Co.*, 96 U. S. 1; *G. F. Co.* v. *Pennsylvania*, 114 id. 196; *Com.* v. *S. O. Co.*, 101 Penn. St. 119.) On the face of the statement filed by the relator with the commissioners of taxes and without inquiry as to what proportion of its general indebtedness should be offset against its New York items, the assessment could not have been made at a greater sum than $730,000. (*People ex rel.* v. *Barker*, 139 N. Y. 55; 141 id. 251.) The relator was entitled to offer evidence showing how much of its indebtedness was due on account of the acquisition of its New York assets or incurred in the purchase

thereof. (Laws of 1880, chap. 269, § 4; *In re Corwin*, 135 N. Y. 252; *People* v. *Comrs.*, 39 N. E. Rep. 385; *People ex rel.* v. *Gray*, 45 Hun, 243; *People ex rel.* v. *Keator*, 17 Abb. [N. C.] 369; *People ex rel.* v. *Barker*, 26 N. Y. Supp. 519; *People ex rel.* v. *Zoeller*, 15 id. 684; *People ex rel.* v. *Barker*, 22 id. 1043; *People ex rel.* v. *Barker*, 24 id. 63; *People ex rel.* v. *Barker*, 81 Hun, 22.) This appeal cannot be dismissed. (*People ex rel.* v. *Tax Comrs.*, 144 N. Y. 483.)

*David J. Dean* for respondents. The relator is taxable for the sums invested by it in business in this state, even if it be in fact insolvent. (Laws of 1855, chap. 37; *People ex rel.* v. *Barker*, 141 N. Y. 118.) There is no force in the contention made by the relator that the words, "sums invested in any manner in said business," used in the statute of 1855, mean simply the sum of cash which the relator had on hand in this state at the time it commenced business. (*People ex rel.* v. *Comrs.*, 23 N. Y. 242; *Hitt* v. *Crosby*, 26 How. Pr. 413; *Scott* v. *De Peyster*, 1 Edw. Ch. 513; *M. Ins. Co.* v. *Suprs.*, 4 N. Y. 442, 448; *People* v. *Suprs.*, 16 id. 424, 439; *People ex rel.* v. *Coleman*, 126 id. 433, 439; *People ex rel.* v. *Wemple*, 138 id. 582, 588; *People ex rel.* v. *Barker*, 141 id. 196, 197; *People ex rel.* v. *Barker*, Id. 118; *People ex rel.* v. *Barker*, 145 id. 239.) There was no error in excluding the testimony which the relator sought to introduce at the Special Term. (Laws of 1880, chap. 269, § 4.) As to the proceeding relating to the taxes of 1893, the testimony taken before the referee for the reason that it was not before the commissioners when they made their assessment, or offered to them, should be disregarded. (*People ex rel.* v. *Barker*, 75 Hun, 6; *People ex rel.* v. *Tax Commissioners*, 56 N. Y. S. R. 641; *People ex rel.* v. *Tax Commissioners*, 61 id. 70, reversed on another point, 144 N. Y. 483.) The decision in *Thurber-Whyland Co.* v. *Tax Commissioners* (141 N. Y. 118) is conclusive in this proceeding.

PECKHAM, J.   The above relator obtained two writs of cer-
tiorari under chapter 269 of the Laws of 1880, for the pur-
pose of reviewing the action of the above defendants in assess-
ing the relator for all sums invested in its business in this
state in the years 1893 and 1894, a separate writ having issued
for each assessment.   The defendants were commissioners of
taxes and composed the board of taxes and assessments of the
city and county of New York, and they made an assessment
in each of the above years against the relator which is a for-
eign corporation having money invested in this state, such
assessment being based upon the provisions of the act chapter
37 of the Laws of 1855, one section of which reads as fol-
lows : " All persons and associations doing business in the state
of New York as merchants, bankers or otherwise, either as
principals or partners, whether special or otherwise, and not
residents of this state, shall be assessed and taxed on all sums
invested in any manner in said business the same as if they
were residents of this state, and said taxes shall be collected
from the property of the firms, persons or associations to
which they severally belong."   The relator disputes the
validity of each assessment.   The defendants, in 1893, assessed
the relator at a certain sum, after deducting that portion of
its indebtedness which they decided had been incurred in this
state in the purchase of property herein, and in 1894 they
made an assessment without deducting any of the indebted-
ness of the relator whatever.   The relator claims that the
defendants, in 1893, did not deduct all its indebtedness which
had been incurred in the purchase of property within this
state, and that if they had done so, there would have been no
assessment made against it here.   It also claims that the assess-
ment of 1894 was void because of the refusal of the defend-
ants to make any deduction whatever for any indebtedness.
The reason for the difference in the two assessments is based
by the defendants upon the decision of this court in *People
ex rel. Thurber-Whyland Co.* v. *Barker et al.*, reported in
141 N. Y. 118.

That case was decided here subsequent to the assessment of

1895.]    People ex rel. Milling Co. v. Barker.    35

N. Y. Rep.]    Opinion of the Court, per Peckham, J.

1893 and prior to that of 1894. The defendants were of opinion that the decision in question covered this case and obliged them to assess the relator without making any deduction for any indebtedness whatever, even though such indebtedness, or some portion thereof, were incurred in the purchase of the assets in this state, for which the assessment of 1894 was made.

Prior to the time for finally making the assessment for each of the two years 1893 and 1894 respectively, the relator rendered to the defendants a verified written statement of the condition of the company as of the second Monday of January in each of such years. The statement of 1893 shows that the total gross assets in all parts of the world then belonging to the relator amounted to $4,615,326.07, and from that sum it was claimed should be deducted the amount assessed against it for its real estate, being $451,300, and the sum of $2,500,000 for bonds issued by it, and also $2,567,000 for further indebtedness incurred by it in the course of its business, thus claiming a total deduction for indebtedness (including the assessment for real estate) of $5,518,300, or almost a million dollars of debts over assets, and reducing the assessment of course to nothing.

It does not appear that any receiver of the company has been appointed or applied for, or that any proceedings have been taken or were contemplated for the winding up of what by this statement would appear to be a hopelessly insolvent concern. The president of the company was examined in regard to the assessment of 1893, before the commissioners, and he testified that the company was organized August 27, 1892, less than seven months prior to the making of this statement. The president further testified that the nominal capital was five millions of dollars, two millions of preferred and three millions of common stock. That $2,000 in cash were paid into the treasury for 20 shares of its capital stock at par, and that sum was paid out for corporation expenses. He was unable to state whether in issuing the stock at the time the company was organized it acquired anything beyond the tan-

gible assets of the firm or parties whose property was pur-
chased. The first meeting of the directors was held August
27, 1892, and at that meeting its bonds secured by mortgage
were issued, and eight hundred and twenty of them of one
tnousand dollars each were sold for cash at par, and the money
brought into New York and deposited in the bank with which
the company did business, and was subsequently used for the
purchase of merchandise used by the company. The question
was then asked of him : " And the rest of the capital stock
and the balance of the bonds were issued in exchange for real
and personal property ? " and he answered " Yes."

From this statement of 1893, and from the examination of
the president of the company, it appears that all but $2,000 of
its capital stock of $5,000,000, and the $2,500,000 of its bonds
had been issued in exchange for property, real and personal,
between the 27th day of August, 1893, and the second Mon-
day of January, 1894, the cash for the $820,000 of bonds
issued having been used for the purchase of merchandise.
Further than this it appears that $2,567,000 of further indebt-
edness had been incurred upon its notes for borrowed money,
loans to it on collateral and on bills for merchandise. This
would make about $10,000,000 invested by the relator within
this short period and yet it makes a statement that its total
gross assets existing on the second Monday of January, 1893,
amounted to but $4,615,326.07. No explanation is vouch-
safed for these seemingly most unfortunate investments. It
might, perhaps, be thought there was a mistake in the record
from which I have quoted, and that the stock had in fact
never been issued to any such amount. The statement for
1894 would seem to show there was no mistake of that nature,
for it is there stated that the entire share capital, except the
twenty shares already spoken of, and the entire issue of bonds,
except the 820 sold for cash, were exchanged for property.
Ten millions of investments in five months, and at the end
thereof less than five millions left ! In January, 1895, its
relative condition was about the same ; its gross assets had
shrunk from $4,615,326.07 to $3,466,919, being considerably

over a million of dollars, but its indebtedness was less by $1,046,500.

And yet this (seemingly) insolvent corporation is paying interest on its bonded indebtedness and dividends upon its stock. These facts call for explanation. There is no doubt that the astute and able counsel for the city would have made the effort to obtain it had not the defendants proceeded upon the theory as to the tax of 1894 that the amount of indebtedness was in any aspect immaterial and the amount of assets in this state was sufficient for an assessment for 1894, which would be fair if no deduction for indebtedness were allowed. As to the assessment for 1893, in which there was some allowance for indebtedness, the relator claims that the entire face value of three of the items entering into that assessment, viz., for machinery and tools, office furniture and horses and trucks, making a total of over $800,000, should have been deducted in addition to the amount already allowed by the defendants for indebtedness incurred for the purchase of assets in this state. The decision of the defendants in this regard as to what amount of indebtedness was actually incurred in the purchase of the assets in this state in 1893 was made upon a question of fact, in regard to which the evidence on the part of the relator was by no means of that clear and convincing character which could leave no doubt as to the fact. The assessment itself depended also upon the different kinds of property making up the assets of the relator in this state, and it was not made at all plain as to what the real and true value of such assets was. We do not feel called upon to review and reverse the determination of the defendants as to the true amount for which the relator should be assessed for the year 1893. There was some evidence to support their determination, and that is sufficient for us. It is not plain that any erroneous theory of assessment was adopted.

The orders of the Special and General Terms will, therefore, as to that assessment, be affirmed.

We are now brought to the consideration of the assessment for 1894, founded upon the *Thurber-Whyland Company* case above referred to.

We think an erroneous use has been made of the decision of this court in that case, and that the assessment now before us for 1894 must be set aside. Upon another examination of the subject, carried on by the defendants, commissioners, a more thorough investigation may be made, so far as it shall appear necessary, for an accurate assessment against the relator for all sums invested by it in this state.

The question is as to the true construction to be given those words of the statute which provide that all persons non-residents of the state and doing business herein "shall be assessed and taxed on all sums invested in any manner in said business the same as if they were residents of this state," etc. What is meant by the words "sums invested in any manner in said business?" The inquiry must of course be confined to the meaning of the words as used in this statute and for the purpose of an assessment upon such sums for taxation.

The case of the *Thurber-Whyland Company* held that a foreign company having assets in a foreign state could not invest some of its capital here and rightfully claim a deduction from such sum invested of all its indebtedness. That company admitted an investment here of at least $750,000, and its total indebtedness was over $1,200,000, consisting of open accounts and of bills payable. There was no claim set up as to the right specially to deduct the specific indebtedness arising upon the purchase of the very assets in New York in regard to which the assessment had been made. Very possibly language was used in that case in the course of the opinion which might be capable of a construction broader than was called for by the facts appearing in that record. If so, it would be but another illustration of the truth and importance of the principle which makes it necessary to construe the language used in judicial opinions strictly with reference to the facts which exist in the case which is decided. It was stated in that case that the court was of opinion that the act did not contemplate the deduction of debts from the sum invested in this state by non-residents. As then applied, the language was appropriate, although it might well have been more definite

and precise. That company had assets at its home office enough to permit a deduction of all indebtedness asserted, and there was no claim that was argued that any of it had been incurred in the purchase of property in this state which formed the basis of the assessment. Under such circumstances we held, and, as we think, properly held, that the place for the deduction of general indebtedness was the residence of the person or corporation, and that the sum invested here should not be diminished by a deduction of any part of such general indebtedness. The question we are now to decide is what is the sum invested in this state by a foreign corporation which purchases property here, and pays cash for a portion of it, and promises to pay the balance at some future day.

This relator is engaged in the business of milling in this state. Suppose it brought one hundred thousand dollars into this state, and bought two hundred thousand dollars worth of wheat to be manufactured into flour, and paid for it with the hundred thousand dollars in cash, and gave its notes for the balance. The ownership of the wheat passes to the relator by the purchase, and in that sense it can be said it owns wheat to the amount or value of two hundred thousand dollars. Has it, however, under this statute invested in this state any sum beyond the one hundred thousand dollars which it paid in cash for the wheat? Is its promise or liability to pay the other hundred thousand, a sum invested in this state by it, and is it the same as cash for the purpose of taxation? Is the fact that the company has in its possession as ostensible owner the two hundred thousand dollars in value of wheat conclusive evidence that the company has invested that sum in its business in this state, when in truth it has paid a sum amounting to but half its value, and has promised to pay the balance at some future time? It seems to us there can be but one answer to these questions. The sum invested is the sum paid and not the sum which is promised to be paid on a future occasion. It is true the purchaser has in its possession as nominal owner, wheat to the value of two hundred thousand

dollars, but it cannot be said to have invested within the meaning of this statute two hundred thousand dollars in the purchase of the wheat as long as it has in fact paid but one-half that sum and has simply promised to pay the other half at a future day.

No part of the value of the wheat is lost to taxation by this holding; neither is the sum so lost which was brought into the state by the relator and invested in the wheat. The vendor of the wheat is taxed for the one hundred thousand dollars he has received as part payment for the same, and he is also taxed for the one hundred thousand dollars of notes he has received from the purchaser of the wheat on account of the balance due for the purchase money, and the relator is taxed the $100,000 cash it has brought into the state and invested in this wheat, and there is thus an assessment of $300,000 made between these two, the vendor and the vendee of the wheat, and that is all the property that is then subject to taxation. To tax the full value of the wheat in the hands of the purchaser is in reality to tax the purchaser on its own indebtedness. Its promise to pay in the future the other hundred thousand dollars is not a sum invested by it here until it has redeemed its promise and paid its notes. The transaction is in truth substantially the same whether the payment has been secured by a chattel mortgage on the wheat or not, although if the payment have been thus secured, the purchaser has not even obtained an unincumbered title to the wheat until the payment is made. And so long as the property purchased has not been paid for in full, then the amount still due upon it ought to be deducted as not representing any sum invested by the purchaser in this state. Otherwise it is to say that the relator has invested a sum in this state by merely promising to do so at some future day. If after the purchase the wheat should appreciate, the whole of such appreciation would of course go towards swelling the amount invested by the relator in this state, and the contrary would be the case if it should depreciate; the indebtedness being a fixed quantity in both cases it would not be altered or affected by either event.

The same thing would happen in case the relator purchased

the wheat and paid nothing for it, but gave its notes even without a mortgage for the whole amount. In such case the relator could not be said to have invested any sum in its business, assuming of course that the wheat was worth no more than its purchase price. Instead of paying, it had simply promised to pay for it. The vendor in such case would be assessed on the notes he took for the price of the wheat instead of for the wheat itself and the relator would not be assessed at all. This would be right because no more property had been created by the sale than existed before its consummation, and there would be an assessment levied for the full amount that had been levied before or which would have been levied if no sale had been made. The relator would not have invested any sum in its business until it paid something on its notes or until the property purchased had appreciated beyond the purchase price thereof. A gift of the property would be different. In that case while the relator would not have actually taken money or brought it into the state for investment and invested it in the property, yet it would have received the property as absolute owner with no outstanding liabilities to pay for it, and being in such case the owner of the property it would answer the description of a sum invested in its business and thus be liable to assessment under the act.

This treatment of the question is not in fact to be regarded in the light of a strict deduction of debts from assets; it is construing the meaning of the statute and determining what in reality is the sum invested by a non-resident individual or corporation under these circumstances, in the business in which he or it is engaged in this state. It is not adjusting the equities as spoken of in the *Thurber- Whyland* case, which we then held should be done at the place where the corporation was a resident. It is a different thing from ascertaining the general and gross assets of a non-resident to be found within the state, and from that sum deducting all its debts whenever and upon whatever cause incurred. The non-resident corporation investing a sum of money in this state is to be assessed for the full sum it invests here, although it may owe debts

enough outside of such investment to render it insolvent. The indebtedness it has incurred in the transaction from which the purchase of the property is the result, is no part of the sum it has invested in such purchase and no assessment can be made which includes the amount of that indebtedness. But the stock which a corporation issues in payment for property is not a debt incurred by it. The scrip for the stock is merely a certificate to the holder to certify as to his interest in the property of the corporation, which interest is his share of the property that remains to it after the payment of all its debts.

Construing the statute as we do, it follows that the assessment of 1894 cannot stand. Upon a rehearing of the case by the assessors it will be most appropriate to endeavor to learn what kind of property was obtained in exchange for the stock, bonds and notes of the company amounting to ten millions of dollars, where it is situated, how much it is in fact worth or what has become of it and how it has to the extent claimed disappeared or shrunk in value. It is a case which indeed calls for rigid examination and investigation to learn if possible how a corporation seemingly by its prepared statements insolvent, can go on and pay interest on its mortgage debt, dividends on its stock and keep clear of all hostile steps from its other creditors.

Our conclusion is that the orders of the General and Special Terms in relation to the assessment of 1893, must be affirmed, with costs, and those in regard to the assessment of 1894 must be reversed and the defendants directed to make a new assessment in conformity to the facts and to the views set forth in this opinion.

All concur.

Ordered accordingly.